**Sylvia M. PEREZ, Plaintiff,**

v.

**Shirley CHATER, Commissioner of the Social Security Administration, Defendant.**

**No. CV 96–0197(JG).**

United States District Court, C.D. California.

May 2, 1997.

Lawrence D. Rohlfing, Santa Fe Springs, CA, for Sylvia M. Perez, plaintiff.

Nora M. Manella, U.S. Attorney, Leon W. Weidman, Assistant U.S. Attorney; Chief, Civil Division, Ira A. Daves, Assistant U.S. Attorney, Los Angeles, CA, for Shirley S. Chater, Commissioner of the Social Security Administration, defendant.

## MEMORANDUM AND ORDER

(Social Security)

GROH, United States Magistrate Judge.

Plaintiff has filed a complaint under 42 U.S.C. § 405(g) seeking review of the decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits under Title II of the Social Security Act. Defendant has answered and the parties have filed cross-motions for summary judgment. For the reasons discussed below, I conclude that the Commissioner's decision should be reversed and the case remanded for further proceedings.

## BACKGROUND

On July 30, 1992, plaintiff filed an application for disability benefits, claiming disability since September 12, 1990, due to carpal tunnel syndrome. (Administrative Record (A.R.) 96, 138.) Initially and upon reconsideration, her application was denied, and she received a hearing before an Administrative Law Judge (ALJ) on September 12, 1994. (A.R.31, 56–74.) In a written decision dated March 24, 1995, the ALJ found that plaintiff had the following impairments: severe back pain, status post carpal tunnel syndrome associated with degenerative changes of the hand, rheumatoid arthritis, venous insufficiency to the legs, chronic Bell's palsy,[1] and

---

1. Bell's palsy is a paralysis of the muscles of the face due to disease or injury involving the facial nerve. The paralysis usually affects one side of the face, which becomes distorted; the mouth is drawn to the opposite side by the pull of the unaffected muscles, and the eye cannot be completely closed. 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine,* at B–40 (1996 ed.).

chronic diarrhea. He concluded that plaintiff retained the residual functional capacity to perform a reduced range of light work. He further found that she had no transferable skills. (A.R.41.) Citing Rule 202.21 of the Medical–Vocational Guidelines, 20 C.F.R. Appendix 2, Subpart P (the "grids") and the testimony of a vocational expert, the ALJ found plaintiff not disabled at step five of the sequential evaluation process.[2] (A.R.40, 41.) The Appeals Council denied plaintiff's request for review (A.R.4–5), and the ALJ's decision stands as the Commissioner's final decision in this case.

## RELEVANT RECORD EVIDENCE

Born on April 27, 1945, plaintiff was 49 years of age when the ALJ's decision was issued, and had completed high school. (A.R.49.) She worked as a licensed cosmetologist from 1964–1979 (A.R.49), as a waitress from 1979–1981 (A.R.510), and as a bench machinist at Rockwell International from October 1981–September 1990, when she was placed on temporary disability due to carpal tunnel syndrome. (A.R. 60, 134, 186, 430, 510.) There is no evidence that she has engaged in substantial gainful activity since September 1990.

Plaintiff has an extensive medical history, having undergone multiple surgical procedures and other treatment for a variety of medical conditions. However, much of the treatment reflected in the record predates the alleged onset of disability (in September 1990) from carpal tunnel syndrome. In 1976, plaintiff had an intestinal bypass operation (for the treatment of morbid obesity [3]), performed by Dr. Kouri. (A.R.367.) In 1982, Dr. Bryan performed a series of urological procedures, including removal of a kidney stone. (A.R.201, 320, 394–412.) Plaintiff had foot surgery by Dr. Ahern in 1983. (A.R.366, 466.) Between 1984 and 1990, Dr. Kahn performed several surgical revisions of the intestinal bypass; a wound reclosure operation; and a surgical excision of an occipital mass. He also treated plaintiff for ongoing complications of her bariatric surgeries (including recurrent metabolic imbalances, diarrhea, and arthritic/pleuritic complaints), gynecological problems, depression, and hand and wrist pain. (A.R.321, 325, 367–373, 377–379, 388–393, 413–434.) During roughly the same period—from 1985 to 1990—plaintiff saw several physicians at the Rosecrans and Mullikin Medical Groups (Drs.Wong, Bergscheider, Csepanyi, Grindstaff, Donaldson, Grizzell, Saunders, Taubman, Olson) for the following conditions: diffuse arthritis with history of erythema nodosum [4]; Bell's palsy; fatty liver; magnesium imbalance; vaginitis; lumbosacral strain; severe bilateral calluses, toe deformities, bunions, and corns; hemorrhoids; bronchitis and laryngitis; gas; and a left leg contusion. (A.R.456–485.)

On September 12, 1990, Dr. Kahn referred plaintiff to Dr. Co, a neurologist, who diagnosed right carpal tunnel syndrome (CTS) of moderate severity. (A.R.161–162.) Plaintiff was thereafter referred by her employer to Dr. Chen, an orthopedic surgeon, who diagnosed bilateral CTS. Dr. Padova, an indepen-

---

2. The regulations prescribe a five-step evaluation. 20 C.F.R. §§ 404.1520, 416.920. In summary, in order to determine disability:

   [t]he following steps are addressed in order. (1) Is the claimant presently unemployed (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Does the impairment prevent the claimant from performing his/her past relevant work? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

   *Garfield v. Schweiker*, 732 F.2d 605, 607 n. 2 (7th Cir.1984); *see also Baxter v. Sullivan*, 923 F.2d 1391, 1395 (9th Cir.1991).

3. Morbid obesity is obesity of such magnitude that it prevents or interferes with normal or average activity. In extreme cases, even slight exertion may cause death from respiratory failure. 3 Schmidt at M–248. Plaintiff's height was recorded in the record as approximately 5'5". She reported that she weighed 275 lbs. when the bypass was performed. (A.R.316.) Her weight fluctuated between approximately 185 and 218 lbs. in the 1985–1994 period covered by the medical reports of record. (A.R.198, 246, 248, 267, 272, 300, 456, 462, 496.)

4. Erythema nodosum is an inflammation of the skin marked by the presence of small lumps which cause intense itching and burning. The eruptions may be associated with rheumatic fever and usually appear on the legs. 2 Schmidt, *supra* n. 1, at E–158.

dent medical examiner for the Workers' Compensation Appeals Board who evaluated plaintiff in December 1990, concurred with that diagnosis. (A.R.185–186, 203, 205, 188–206.)

Dr. Chen performed a total of three corrective surgeries on plaintiff's hands, ultimately discharging plaintiff from his care on May 8, 1992, when he concluded that her condition was "permanent and stationary," with "minimal permanent disability." [5] (A.R. 431, 163–187, 208–217, 380–383.) His objective findings included a well-healed scar, slightly abnormal nerve conduction findings, and slight grip weakness. Subjective factors were mild to minimal pain, mild numbness, and morning stiffness of the right hand. (A.R.163, 166.)

Plaintiff underwent operations to remedy toe deformities in November 1991 and again in February 1992. (A.R.231–256.) In November 1992, plaintiff underwent a procedure to remove varicose veins, performed by Dr. Kuhn of Mulliken Medical Center. (A.R. 219–226, 303, 305, 306, 308.) In December 1992, Dr. Wilson, who performed two orthopedic examinations at Rockwell's request, opined that plaintiff had recovered from the effects of CTS, displayed minimal objective or subjective evidence of disability, and did not need vocational rehabilitation. (A.R.257–271.) One month later, in January 1993, Dr. Jaffin, an orthopedist who briefly treated plaintiff, concluded that the residual effects of plaintiff's CTS warranted a work restriction prohibiting repetitive squeezing, gripping, pinching, pushing, pulling, typing, and forceful grasping. (A.R.275, 272–297.) He also recommended vocational rehabilitation and access to future medical care. (A.R.274–275.)

Dr. Tamayo, an internist who examined plaintiff at the Commissioner's request in January 1993, diagnosed mild costochondritis, hypomagnesia, chronic diarrhea, back pain with decreased range of motion, venous insufficiency in both legs, chronic left Bell's palsy, and, by history, residual pain, weakness and numbness from CTS, and rheumatoid arthritis. (A.R.313.) She did not mention any specific functional restrictions. Another consultative examination was performed on behalf of the Commissioner in January 1993 by a psychiatrist, Dr. Paculdo, who opined that plaintiff could communicate effectively, sustain focused attention, follow and understand simple instructions, and adapt to common work stressors. (A.R.317.) His diagnosis was dysthymia and the prognosis was good. (A.R.318.)

Plaintiff consulted Mulliken physicians a total of three times in December 1992 and April 1993 (including, on two occasions, Dr. Wong) with complaints of musculoskeletal pain and tender nodules; the assessments noted were bypass arthropathy/dermatitis syndrome, fibromyalgia, hypomagnesia, and "muscle spasms—psychogenic." (A.R.300, 302, 307.) There is no record of treatment after plaintiff's April 5, 1993, visit to Dr. Wong.[6]

Dr. Mandel, an "agreed medical examiner" jointly selected by the parties to plaintiff's workers' compensation case, examined plaintiff in October 1993, reviewed plaintiff's voluminous medical records, and submitted a detailed, comprehensive twenty-three page report. (A.R.320–343.) Citing plaintiff's medical history (in particular, her use of "massive amounts" of steroidal and nonsteroidal drugs), Dr. Mandel opined that she had longstanding medical problems secondary to her intestinal bypass procedure "with its alteration in metabolic function," which,

---

**5.** Dr. Chen initially released plaintiff to work effective July 1, 1991; she was unable to return to her job, however, because she was laid off on that date. Later that month, moreover, she returned to Dr. Chen with a thumb problem and remained under his care until May 1992. (A.R.60, 167, 171–173.)

**6.** The "subjective" portion of Dr. Wong's notes of that visit indicate that plaintiff complained of joint pain with tender nodules and told him she had been unable to work for three years. She also said she had received 8 ACTH injections from Dr. Kahn since February 15, 1993, and was unable to sleep due to pain, for which she had to take Vicodin or Lortab, both narcotic analgesics. In the "objective" section of the report, he noted wrist and knee pain and tenderness on extension and the presence of tender erythematous nodules. In the assessment portion of his notes, he recorded a diagnosis of bypass arthropathy/dermatitis syndrome and made the notation "pt unable to work [secondary] to medical condition past 3 yrs."

in turn, affects nerve function and may cause musculoskeletal difficulties. (A.R.329, 330.) In plaintiff's case, the repetitive use of her hands at work "undoubtedly aggravated" her preexisting arthritic condition, precipitating CTS. Dr. Mandel characterized plaintiff as "temporarily totally disabled" from CTS from September 1990 until mid-November 1991 but suggested that she was "unemployed" as opposed to "disabled" thereafter. (A.R.332–333.)

While noting some discrepancies between the clinical data and plaintiff's subjective complaints, Dr. Mandel opined that a "subtle undefined metabolic problem ... coupled with the Raynaud's phenomenon [7] and a neuropraxia" could be causing cold hands and difficulty grasping. (A.R.332) He concluded that plaintiff suffered an apportionable permanent disability; industrial exposure accounted for a grip loss of 30–32% in both hands, slight and intermittent pain, increasing to moderate with upper extremity use, tingling, numbness, easy fatigability, night pain, and a loss of sensory perception, while nonindustrial causes (specifically, metabolic problems secondary to her bypass surgery) accounted for the remainder of her grip strength loss, cold hands, impaired capillary filling, and part of her pain and irritability.[8] (A.R.333.) He recommended vocational retraining, noting that she would be subject to a work restriction against "repetitive picking up, pinching, grasping, twisting, or torquing." (A.R.333.) He felt that she would need only conservative care at six-month intervals for her work-related impairments, in that neither further surgery nor therapy was indicated; however, plaintiff required "considerable follow-up care" for her other impairments. (A.R.336.) Specifically, she needed treat-ment for her "Raynaud's and/or other vasospastic problems" and should continue to see Dr. Kahn for treatment of her gastrointestinal problems and regulation of her medications. (A.R.335.)

For purposes of her workers' compensation case, plaintiff underwent internal medical and pulmonary examinations by Dr. Lonky in November 1993, and by Dr. Zagelbaum in April 1994. (The former was apparently arranged by her lawyer and the latter by Rockwell.) (A.R.435–455, 492–509.) Dr. Lonky found that plaintiff had rhinosinusitis and chemical bronchitis, in remission, and must avoid exposure to dust, fumes, or smoke. (A.R.445–447.) Dr. Zagelbaum opined that plaintiff had no respiratory impairment. (A.R.492, 506.)

In a brief letter dated September 8, 1994 (four days before the hearing), Dr. Wong opined that plaintiff had been unable to work since 1990 and was permanently medically disabled. (A.R.488.) In a September 9, 1994, letter, Dr. Kahn also opined that plaintiff was unable to work. (A.R.434.)

Plaintiff was represented by counsel at the September 12, 1994, hearing before the ALJ. Testimony was received from plaintiff and a vocational expert. Plaintiff testified that she had not worked since 1990 due to symptoms of carpal tunnel syndrome, fibromyalgia,[9] chronic arthritis, stomach bypass surgery complications, back pain, and pleurisy. (A.R.61.) She stated that "maybe a couple times a month" she suffers attacks of pleurisy lasting three to five days, resulting in painful swelling in the area of the lungs and difficulty in breathing and raising her arms, and had been taking antibiotics (Cipro or Flagyl) daily since 1970 to help control the

---

7. Raynaud's disease is the term for a blood vessel disorder characterized by intermittent attacks of pallor or cyanosis (bluish discoloration) of the upper extremities, especially of the fingers or toes, and sometimes of the ears and nose, usually associated with emotion or exposure to cold. 4 Schmidt at R–34.

8. Total grip strength loss was estimated at 70% in the dominant right hand and 60% in the nondominant left. Dr. Mandel also found pinch strength loss of 50% bilaterally, sensory loss in median and ulnar nerve distributions bilaterally, minimal signs of nerve irritability, normal x-rays and normal nerve conduction studies. (A.R.329.)

9. Fibromyalgia is one of a group of nonarticular (not affecting joints) rheumatic diseases characterized by dull and persistent pain, tenderness, and stiffness of (1) muscles, (2) regions where tendons are inserted into bones, and (3) nearby soft issues. These symptoms can be due to overuse of muscles or be secondary to another, underlying disorder. Causes of fibromyalgia are physical and/or mental stress; restless or inadequate sleep; exposure to cold, especially cold dampness; a rheumatic disease; Lyme disease or other virus infection; psychogenic or psychosomatic factors. 2 Schmidt at F–55, 56.

pleurisy. (A.R.61–62.) She further attested that she has flare-ups of rheumatoid arthritis "every couple of months" for three to four days. (A.R.64.) During these episodes, she becomes stiff and needs assistance getting in and out of the car and using the bathroom. (A.R.63–65, 79.) She stated that her physician, Dr. Kahn, administers ACTH (adrenocorticotropic hormone) [10] injections when her arthritic symptoms recur and that she also takes Lodine (a non-steroidal anti-inflammatory) daily. (A.R.66.)

Plaintiff testified that she experienced pain, coldness, stiffness, discoloration, and occasional numbness in her hands, which had first bothered her in the late 1980s. She recounted that she sometimes dropped things, had difficulty cooking, and burned herself without realizing it. (A.R.66, 79–80.) She stated that she sometimes slept with braces or gloves on her hands to relieve pain, numbness, and cold. (A.R.66–68, 80.) When her pain was "real bad" at night, she took Vicodin,[11] which provided some relief; during the day she took Toradol.[12] (A.R.67, 69, 72.) She stated that she had arthritis in her feet and legs, leading to difficulties bending, standing up, sitting, and walking. (A.R.68.) She had been prescribed a cane but did not like to use it because she felt "kind of dumb;" if necessary, she held onto things as she walked. (A.R.69.) She attested that she did not have "any strength" in her hands; she subsequently stated that she could pick up and put on her glasses, slowly fix her hair, and sometimes lift a gallon of milk from the refrigerator, although not from the top. (A.R.69, 79–80.) She testified to pain in her toes, which remained malformed despite surgery, but said she did not require orthopedic shoes. (A.R.70.) She also attested that she suffered chronic diarrhea stemming from her stomach bypass and had bowel movements 7 to 14 times a day. She had occasional nighttime accidents in bed and used a mattress pad but did not wear protective undergarments. (A.R.83, 84.)

Plaintiff attested that she took the medications listed on her medications form (A.R. 511, 513) "daily." (A.R.72.) She experienced some dizziness and forgetfulness, but indicated that she was unsure whether "it's the medication or it's just me." (A.R.71.) She further testified that she could, at times, cook, change bed sheets, wash dishes, and do laundry, taking breaks as needed. (A.R.72–73.) She avowed that she very seldom ironed and did not sweep or work in the yard, but later mentioned that she swept the back porch, where she liked to spend time. (A.R.72–73.) She went shopping for groceries or clothing with her son or another family member. (A.R.75–76.) She walked the seven or eight minutes to church "all the time," even if stiff. (A.R.78.) She watched TV but read little and could no longer crochet. (A.R.77.) She visited her mother and her daughter's family and also received visitors at home. (A.R.77–78.)

Plaintiff avowed that "good" days, she could stand for an hour and a half, sitting down and then getting up, and could walk for a maximum of 15 minutes before resting and resuming her walk. (A.R. 78.) On "bad" days—which "usually" numbered three or four a week—she might need to be assisted to the bathroom in a wheel chair by her husband or son and did little or nothing due to pain and stiffness.[13] (A.79, 81–82.)

**10.** ACTH a hormone that stimulates the outer cortex of the adrenal glands, which produce a variety of steroid hormones. *Webster's New World Dictionary,* Third College Edition (Simon & Schuster 1988).

**11.** Vicodin is a narcotic analgesic with effects similar to codeine, and is indicated for relief of moderate to moderately severe pain. *Physician's Desk Reference* at 1357 (50th ed. 1996) (*PDR*).

**12.** Toradol is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the short-term (up to 5 days) management of moderately severe, acute pain, that requires analgesia at the opioid level. *PDR* at 2159, 2162.

**13.** On cross-examination, plaintiff testified that by "bad days," she meant

> Where I don't do nothing. I don't feel good. I take my medication. I—it's just that I don't feel good. My hands hurt. My back hurts. My legs hurt. My feel hurt or I'm stiff. I get to stiff to where—the fibromyalgia, I don't know. the fibromyalgia, it feels like you are carrying a cross in the back. I have it from shoulder to shoulder and straight down. When you bend it hurts. When you move your shoulder it hurts. And it's best just to lay on the side and don't move. Just stay there for a little while. It goes away. I drink my medication and after a while it seems like it relieves it. But it's not a very good time for me.

The vocational expert called by the Commissioner testified that plaintiff's past work as a bench machinist was sedentary and had an SVP (Specific Vocational Preparation) level of four, making it semi-skilled.[14] He described her past work as a waitress as light work with an SVP level of two. (A.R.86.) The ALJ then posited a hypothetical individual of plaintiff's vocational background with the ability to stand 4 to 6 hours, sit 6 to 8 hours, lift 20 pounds occasionally and 10 pounds frequently, and the following additional limitations: no forceful pushing or pulling beyond 10 pounds; a requirement of 5–10 minute breaks from work every hour and a half; occasional decrease in ability to reach at or above shoulder level bilaterally; a limitation in fine manipulation; an occasional limitation in gross manipulation precluding repetitive pinching, twisting, and torquing; decreased grip strength bilaterally; occasional bending, stooping and stair climbing; no squatting; a slight decrease in concentration; and mild anxiety. The expert testified that such a person could perform the work of an information clerk and an inspector, of which 1500 and 640 jobs existed, respectively, in the local economy. (A.R.88, 89, 90.)

Upon cross-examination by the plaintiff's attorney, the expert testified that if the hypothetical individual had a seventy percent grip loss in the dominant right hand and a sixty percent grip loss in the nondominant left (the grip loss given by Dr. Mandel), the number of available inspection jobs would be reduced by half (i.e., to 320). (A.R.92.) He further testified that if exposure to dust, fumes or smoke were precluded, the number of information clerk jobs would be reduced by ten percent (to 1350). (A.R.93.) The expert explained that the job of information clerk (for which he gave DOT number 237.367–022) involved sitting at an establishment, answering questions, and possibly distributing leaflets or pamphlets. (A.R. 91.)

## DISCUSSION

Under 42 U.S.C. § 405(g), the Commissioner's decision is subject to review in order to determine whether: (1) the findings are supported by substantial evidence, and (2) the Commissioner applied the proper legal standard. *Swanson v. Secretary of Health & Human Services,* 763 F.2d 1061, 1064 (9th Cir.1985). "Substantial evidence is more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).

Plaintiff contends that (1) the ALJ improperly assessed the medical opinion evidence; (2) the ALJ erred in discounting plaintiff's subjective complaints; and (3) the ALJ erred finding that plaintiff can performs the jobs identified in his decision.

### 1. Medical Opinion Evidence.

Plaintiff asserts that the ALJ erred in rejecting the September 1994 opinions of Drs. Kahn and Wong that plaintiff was totally disabled. (A.R.433–434, 488.) She also contends that the ALJ improperly evaluated the report of Dr. Mandel. Those contentions shall be addressed in turn.

### a. Dr. Kahn

■ In his September 9, 1994, letter, Dr. Kahn stated that plaintiff's health had "gradually gotten worse" since he began treating her in 1983, to what he believed to be "her complete inability to perform any type of employment duties." (A.R.433.) He noted that acute exacerbations of arthritic/fybromyalgic pain now occur "up to" twice a month and last "up to" three or four days, "during which [plaintiff] states that she cannot perform even the most minimal of basic toiletry and housekeeping needs." (A.R.433.) He also cited her frequent need to rest,

---

14. "Specific Vocational Preparation" is defined in the *Dictionary of Occupational Titles* at 1009 (4th ed.) (DOT) as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.... It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job." An SVP of 4 means that specific vocational preparation of over three months and up to and including six months is required. An SVP of 2 means that up to 30 days' vocational preparation is required. *Id.; see also* Pl's. Mem. at 30 (DOT Exh.).

chronic diarrhea, and "copious" use of prescription medication, concluding, "I can not imagine any position of employment that would allow for limitations such as those listed above, and although [plaintiff] has expressed to me her desire to return to gainful employment, I do not think she is now or will at any time in the future be able to do so." (A.R.434.)

The ALJ concurred with Dr. Kahn's assessment that plaintiff suffers chronic diarrhea and arthritis by history but declined to accept Dr. Kahn's conclusion that plaintiff was precluded from all employment.[15] The ALJ correctly observed that neither Dr. Kahn's treatment notes nor plaintiff's other medical records documented—treatment for

the frequent, prolonged, incapacitating bouts of arthritis/fibromyalgia described in Dr. Kahn's letter (and by plaintiff in her hearing testimony).[16] In fact, there is no record of plaintiff's having seen Dr. Kahn since September 12, 1990, for treatment of any kind, significantly undermining plaintiff's contention that his September 1994 report merits substantial weight.[17] *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (1996) (factors to be considered in determining weight of medical opinions include length, nature, and extent of treatment relationship; supportability; consistency; and specialization); *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983) treating physician opinion entitled to greater weight since he had last examined her.[18] Indeed, the very wording of his letter sug-

---

**15.** To the extent that Dr. Kahn concluded that plaintiff is unable to work because he could not conceive of jobs that are compatible with her functional limitations—rather than on the grounds that her medically determinable impairments prevent her from performing basic work activities—his opinion is beyond the bounds of his competency. *See* 20 C.F.R. §§ 404.1513(c), (d); 404.1527(e)(1); 404.1445; 404.1566(c) (1996). The determination of whether or not a claimant meets the statutory definition of disability is a legal conclusion reserved to the Commissioner; the opinion of a medical source on the ultimate issue of disability is not conclusive. 20 C.F.R. 404.1527(e)(1) (1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).

**16.** While plaintiff had received treatment for symptoms of arthritis, most of the records documenting such treatment pre-date September 1990, the alleged onset date, and indicate that plaintiff's arthritic symptoms were intermittent. (*See, e.g.,* A.R. 194, 200, 202, 204, 206, 208–217, 218–256, 300–303, 315, 329, 417, 419–431, 499–503, 505.) Dr. Wong treated her for arthritic symptoms in 1985 and again in December 1992 and April 1993. (A.R.300–302, 307, 485–486.) Dr. Kahn's treatment notes indicate that plaintiff received treatment in the form of ACTH injections and anti-inflammatory/analgesic medications for arthritic or pleuritic symptoms several times in 1989 and January–February 1990. (A.R.413–431.) By September 1990, her chief complaints were hand and foot problems. (A.R. 430–431, 476–477.)

**17.** Other evidence of record suggests, however, that plaintiff may have seen Dr. Kahn in the interim. For example, plaintiff testified that she saw Dr. Kahn "quite frequently especially when I get, you know, the flare up of the arthritis where I can't even move" and that she received injections from Dr. Kahn "every other month." (A.R. 65.) On a March 1993 disability report, she indicated that she had visited Dr. Kahn six times

in February and March 1993; Dr. Wong made a similar notation in his April 5, 1993, treatment notes. (A.R.149, 300.) Dr. Kahn's September 1994 letter also advised that plaintiff's "complete records in my possession can be made available for copying by submitting the written authorization of the patient." (A.R.434.) If additional medical records do exist, the resources of this court will have been needlessly expended in reviewing an incomplete record. Both plaintiff and the ALJ have a duty to ensure that the record is fully developed. Plaintiff is charged with making "every effort" to provide the ALJ with "all material evidence" before or at the hearing. 20 C.F.R. § 404.935 (1996). Where, as here, plaintiff is represented by counsel, the apparent failure to bring forward records of obvious relevance from a treating source raises legitimate questions about the content of those records. At a minimum, the omission of those records leaves significant gaps in the treatment record. The court is entitled to expect that the disability determination will be made on a fully-developed record, responsibility for which must be acknowledged both by the plaintiff and by the ALJ. *See* 20 C.F.R. §§ 404.935, 404.944, 404.950 (1996); *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir.1983).

**18.** Nor does Dr. Kahn indicate that he reviewed plaintiff's interim medical records, which included, in addition to the opinions and findings discussed *supra* at pp. 1117–1119, x-rays from November 1990, January 1991, November 1992, January 1993, and October 1993 showing little or no abnormality of the lumbar spine, chest, or upper extremities. Although some evidence of bilateral chondrocalcinosis of the knees (calcium salt deposits) was noted, there was no evidence of inflammatory arthritis. (A.R.190, 206, 215, 315, 343, 388.) Nerve conduction velocity studies and an electromyelogram conducted in December 1992 were normal. (A.R.285–288.)

gests that he simply adopted plaintiff's subjective account of her symptoms. On this record, it cannot be said that the ALJ erred by discounting Dr. Kahn's 1994 letter as an accommodation in aid of her disability claim. *See Matney on Behalf of Matney v. Sullivan,* 981 F.2d 1016, 1020 (9th Cir.1992) (ALJ entitled to reject treating physician's opinion because it was based primarily on medical history and subjective complaints related by claimant with minimal examination findings and because doctor had become an advocate for claimant) *see also Saelee v. Chater,* 94 F.3d 520 (9th Cir.1996) (as amended) *cert. denied,* —— U.S. ——, 117 S.Ct. 953, 136 L.Ed.2d 840 (February 18, 1997).

Nor, as the ALJ noted, was there medical evidence that significant arthritic-like symptoms (other than those manifested in her hands) had persisted, or recurred on a regular basis, for any continuous 12–month period on or after September 1990 [19] (or earlier, for that matter). (*See also* note 16, *supra.*) (A.R.37.). *See* 20 C.F.R. § 404.1505(a) (1996); *see also Young v. Sullivan,* 911 F.2d 180, 181 (9th Cir.1990) (disability applicants must meet duration and severity requirements). Moreover, neither the treatment records nor plaintiff's testimony corroborated Dr. Kahn's suggestion that her chronic diarrhea was beyond control.[20] Finally, Dr. Kahn's disability opinion was inconsistent with that of Dr. Chen, plaintiff's treating orthopedic surgeon and a board-certified sub-

specialist in hand surgery, who released her from his care in May 1992, concluding that she had a "minimal permanent disability" from her carpal tunnel syndrome, as well as with that of examining physicians Wilson, Jaffin, Tamayo, Mandel, Lonky and Zagelbaum, none of whom deemed plaintiff totally and permanently disabled. (See pp. 3–8, *supra.*)

On the present record, I conclude that the ALJ offered specific, legitimate reasons for discounting Dr. Kahn's opinion. *See Weetman v. Sullivan,* 877 F.2d 20, 23 (9th Cir. 1989) (rejecting treating physician's opinion that was inconsistent with his examination notes); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir.1989) (ALJ may reject a treating physician's opinion that is brief and conclusory with little in the way of clinical findings to support it).

b. *Dr. Wong*

◼ While crediting most of Dr. Wong's diagnoses, the ALJ rejected Dr. Wong's opinion of September 8, 1994 (four days before the hearing) that plaintiff had been unable to work since 1990 due to post-intestinal bypass arthropathy, dermatitis syndrome, joint complaints, tender nodules underneath her skin, chronic Bell's palsy, and bilateral carpal tunnel syndrome. (A.R.488.) The ALJ observed that there is no medical evidence that plaintiff received ACTH and corti-

---

**19.** After examining plaintiff in September 1990, both Dr. Co, a neurologist, and Dr. Chen, her treating orthopedic surgeon, reported subjective complaints of pain, tingling, weakness, and coldness in her hands, but reported no complaints of arthritis or other musculoskeletal pain. (A.R. 185, 386.) Dr. Chen characterized her past medical history as "no serious medical illnesses." (A.R.185.) In December 1991, Dr. Wilson, a consultative examiner, reported that plaintiff had "no knowledge" of any systemic arthritic condition and had denied arthritic symptoms in the elbows, shoulders, hips, knees, ankles or feet. She complained to him of pain, weakness, and numbness in the hands. (A.R.264–265.) Dr. Chen's reports from January–May 1992, when he last saw plaintiff, mention subjective complaints of mild or minimal hand pain, stiffness, and numbness. (A.R.163–166.) Dr. Jaffin reported that she complained of bilateral hand pain, coldness, weakness, swelling in January 1992, but mentions no other symptoms. (A.R.291.) In January 1993, Dr. Paculdo, a consultative psychiatric examiner, quoted plaintiff as stating, "My

lawyer told me to file for Social Security Disability because they could not do any more surgery on my hands." In December 1992 and March and April 1993, she complained to Drs. Wong and Hall of chest, back, and joint pain, and was prescribed medication. (A.R.300–307.) In October 1993, plaintiff complained to Dr. Mandel of difficulties with her upper extremities but did not complain about her lower extremities. Her chief complaints at that time were hand pain, swelling, and weakness. (A.R.324.)

**20.** Plaintiff testified that she could not distinguish between the need to expel gas and an impending bowel movement, but did have warning enough to allow her to "run" to a bathroom, and felt no need to wear protective undergarments. It is noted that plaintiff continued to work for approximately 14 years after her bypass surgery, despite diarrhea and other complications of that procedure. Plaintiff does not, moreover, specifically challenge the ALJ's functional assessment as it pertains to her chronic diarrhea.

sone injections for "inflammatory arthritis" after 1990, as Dr. Wong indicated. (A.R.38.) (*See supra*, nn. 16 & 17.) Furthermore, although Dr. Wong stated that plaintiff had been followed by his office since January 1985, the degree of his actual involvement in her care is unclear.[21] It is undisputed that he had not seen her since April 5, 1993, roughly a year and a half before she requested a disability evaluation from him. (A.R. 300, 488.) Nonetheless, as noted by the ALJ, Dr. Wong did not conduct an examination or make objective findings in support of his September 1994 opinion, nor did he suggest what functional limitations resulted from the conditions he enumerated.[22] For the same reasons stated above in connection with Dr. Kahn's opinion, I conclude that the ALJ provided specific, legitimate reasons for discounting Dr. Wong's conclusion on the ultimate issue of disability. *See* 20 C.F.R. § 404.1527(d) (1996); *Matney*, 981 F.2d at 1020; *Weetman*, 877 F.2d at 23; *Magallanes*, 881 F.2d at 751.

### c. *Dr. Mandel*

■ The ALJ characterized the October 1993 report of Dr. Mandel (A.R.320–343), the workers' compensation "agreed medical examiner," as "more objective" than those of Drs. Kahn or Wong. (A.R.37.) The ALJ cited Dr. Mandel's assessment that plaintiff was a "good candidate for retraining and future employment," concluding that, "[i]n view of the overall record," plaintiff retained the functional capacity for light work. He

did not otherwise comment on. Dr. Mandel's lengthy examination report and review of records.[23]

Plaintiff asserts that the ALJ should have articulated specific, legitimate reasons for rejecting or discounting Dr. Mandel's functional assessment, which included a 70% grip strength loss in the dominant right hand and 60% in the left, "easy fatigability," and other impairments not expressly set forth in the ALJ's hypothetical.[24] (A.R.329, 333.) Plaintiff also contends that the ALJ erred by failing to give reasons for rejecting Dr. Mandel's finding that plaintiff was "temporarily totally disabled" due to carpal tunnel syndrome from September 1990–November 1991. (Pl's. Mem. at 7–10.)

■ An ALJ is required to state specific, legitimate reasons, based on substantial evidence, for disregarding the opinion of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995) (as amended.). Having determined that Dr. Mandel's report was credible, the ALJ was not permitted to adopt, in piecemeal fashion, only the isolated conclusion that supported his thesis.[25] *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir.1984) (all medical evidence that is credible, supported by clinical findings, and relevant to the question at hand should be considered and discussed by the ALJ). At a minimum, the ALJ was required to explain why he did not accept Dr. Mandel's assessment of plaintiff's functional restrictions and his opinion that plaintiff was temporarily to-

**21.** There are reports of three examinations actually performed by Dr. Wong over an eight-year period (in January 1985, December 1992, and April 1993). (A.R.300, 307, 485) Some of the other records from the medical group with which he was associated (Rosecrans Medical Group/Mulliken Medical Center) mention him as the referring physician or indicate that he was sent a copy of the report. (A.R.456–458, 468, 485–487.) Plaintiff also saw other doctors in the same group for a variety of problems. (A.R.456–484.)

**22.** As noted *supra* n. 6, Dr. Wong made a notation on his April 1993 exam report that plaintiff had been unable to work for three years (as she herself reported to him on that date). While it may thus be said that there is some objective basis for his opinion as of April 1993, his clinical findings of joint pain and tenderness and tender skin nodules (similar to those of December 1992)

were limited in scope and do not seem to adequately support his conclusion that she had been unable to work for the past three years (no does plaintiff expressly so contend). (A.R.300.)

**23.** The ALJ did discuss the findings and conclusions of Drs. Jaffin, Tamayo, Kahn, Wong, Lonky, Zagelbaum, and Paculdo.

**24.** As previously noted, the expert testified that grip strength of this magnitude would erode the base of inspector jobs to about 320. (A.R.88, 90.)

**25.** By the same token, plaintiff cannot very well quibble about the precise meaning of the terms Dr. Mandel used to describe plaintiff's pain. He clearly felt that her subjective symptoms would not prevent her from holding a job that was otherwise compatible with her functional limitations. (A.R.336.)

tally disabled from September 1990 to November 1991.[26]

### 2. Excess Pain

■ "Excess" pain is pain greater than the impairment would normally be expected to produce based solely on the objective medical evidence.[27] The rule regarding the evaluation of subjective complaints was set forth in *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir.1991) (*en banc*):

> [O]nce the claimant produces medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain. (Citation omitted.) Further, although an adjudicator may find the claimant's allegations of severity to be not credible, the adjudicator must specifically make findings which support this conclusion.

■ An ALJ is required to consider other factors, aside from medical opinions, in assessing excess pain testimony. Social Security Ruling 88–13. These include daily activities, the descriptions of intensity and frequency of pain, the type and dosage of any medications taken, the treatment received (other than medication) for relief of pain, and other relief measures employed. *See* 20 C.F.R. § 404.1529(c)(3) (1996).

■ In the instant case, the ALJ relied on plaintiff's January 1993 statements to Dr. Tamayo and Dr. Paculdo to support his finding that plaintiff is able to perform daily activities and thus is not completely disabled. Dr. Tamayo noted that plaintiff took care of her personal hygiene, washed dishes, helped fold clothes, cleaned the kitchen, cooked, wa-

tered the plants, and sat in the backyard. (A.R. 311.) In marked contrast to her hearing testimony, plaintiff also told Dr. Tamayo that her attacks of joint pain and weakness lasted for 2–3 days and that she had experienced such episodes "about three times [in] the past 2 years." (A.R.310.) She also told Dr. Tamayo that she could walk two blocks and pick up ten pounds with both hands. (A.R.310.)

In January 1993, Dr. Paculdo, a psychiatrist, reported that plaintiff needed no assistance with household chores, hygiene, or grooming; "she does the cooking, shopping and all the other household chores." (A.R. 317.) In addition, plaintiff told Dr. Paculdo that she was looking for a job with very minimal use of her hands, suggesting that she did not consider herself totally disabled. (A.R.317.)

The ALJ further noted that plaintiff's testimony about her activities was somewhat inconsistent and that she acknowledged the ability to perform some housework (cooking, changing bed sheets, washing dishes, doing laundry, sweeping back porch) and to go shopping accompanied by a relative. (A.R.37–38, 72–73.) Plaintiff also testified that she took frequent short walks to church and socialized. Furthermore, in connection with her application for benefits, plaintiff admitted that she cooked two meals a day, cleaned the restrooms, socialized, sometimes walked, went shopping, and occasionally drove. (A.R.141, 147.) I find that the ALJ properly determined that plaintiff's daily activities did not support her allegation that her impairments left her incapacitated and unable to work. *See Curry v. Sullivan,* 925 F.2d 1127, 1130 (9th Cir.1990) (as amended on denial of reh'g) (ability to "take care of

---

26. cannot accept defendant's contentions with respect to Dr. Mandel's assessment of plaintiff's credibility and his conclusion that she had been temporarily totally disabled. A careful reading of Dr. Mandel's comments belies defendant's assertion that he seriously questioned plaintiff's credibility. He felt that she showed good effort on the grip strength test, and his suggestion that certain excess symptoms might be linked to "undefined metabolic problems" was not merely "generous speculation." Rather, as Dr. Mandel elsewhere noted, plaintiff's history of metabolic disorders secondary to her surgical history was well-documented, leading Dr. Mandel to believe that subtle metabolic disturbances, coupled with

Raynaud's phenomenon and neuropraxia, could explain subjective upper extremity symptoms not otherwise corroborated by current diagnostic techniques. (A.R.331–333.) Furthermore, both the plain meaning of the words he used and the context of his discussion make it clear that he considered plaintiff to have been medically disabled and unable to work from September 1990 to November 1991. (A.R.332–333.)

27. The rules developed to assure proper consideration of excess pain apply equally to other medically-related "excess" symptoms. *See Swenson v. Sullivan,* 876 F.2d 683, 687–88 (9th Cir. 1989).

personal needs, prepare easy meals, do light housework, and shop for some groceries ... may be seen as inconsistent with presence of a condition that would preclude all work activity.")

Regarding plaintiff's use of medication, the ALJ stated that the claimant's long-term use of her many of her medications is "suggestive of their efficacy." There is no question but that plaintiff has an extensive medications history; nonetheless, the ALJ was not bound to conclude that she was, therefore, disabled. Plaintiff had, in fact, taken several of the listed medications for many years while continuing to work, indicating that those medications successfully controlled her symptoms at least until September 1990, and she was reportedly anxious to return to her work at Rockwell when initially released in July 1991, suggesting that her symptoms were manageable at that time.

Furthermore, as previously noted, there is no medical evidence that plaintiff sought or received treatment of any kind, be it for pain or other symptoms, between April 5, 1993, when last saw Dr. Wong, and September 9, 1994, the date of the hearing, a period of a year and a half. The absence of treatment records for this period seriously undermines plaintiff's allegations that she was immobilized by pain and other symptoms three or four days a week. *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989) (unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment may be sufficient to discredit an allegation of disabling pain). Although plaintiff testified that she was taking the medications shown on her list (seventeen in all) daily, there is no medical record confirming the dispensing of a prescription after April 5, 1993, when Dr. Wong refilled a prescription for Lortab. Plaintiff's stated that all of the listed medications had been prescribed by Dr. Kahn (and her testimony also suggested that Dr.

Kahn administered her medications), yet the last treatment report of record from Dr. Kahn was dated September 1990. It is unlikely that a physician who closely monitored plaintiff's medications before September 1990 (A.R.332, 413–434) would continue to prescribe a laundry list of medications for four years thereafter without seeing her.[28] This is particularly true with respect to narcotic pain-relievers.[29] Similarly, despite testimony that she frequently received injections of ACTH, Norflex, or cortisone from Dr. Kahn for arthritis/fibromyalgia, there are no confirming medical notes for the alleged disability period. Finally, while the medical reports of record confirm that plaintiff had been prescribed a variety of medications, in some cases for extended periods, they nonetheless portray a less consistent, more circumscribed use of medications than is suggested by plaintiff's testimony and forms. (*See, e.g.,* A.R. 196, 234, 300–302, 303, 307, 367, 413–431.)

As is evident from the array of limitations described in his functional assessment, the ALJ did not disregard all of plaintiff's subjective complaints. I am persuaded that, on the record before him, the ALJ's analysis of the excess symptom allegations was adequate. *See generally, Moncada v. Chater,* 60 F.3d 521, 523–524 (9th Cir.1995) (per curiam); *Orteza v. Shalala,* 50 F.3d 748, 750 (9th Cir.1995) (per curiam).

### 3. *Jobs Available*

■ Plaintiff contends that the ALJ erred in determining that plaintiff can perform the jobs of information clerk and inspector cited by the vocational expert. I find that contention to have merit.

■ The ALJ expressly found that plaintiff "does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work." [30]

---

**28.** As noted *supra,* if Dr. Kahn did see plaintiff during this time frame or issue prescriptions, those records must be secured and analyzed on remand.

**29.** Plaintiff's testimony suggesting that she used Vicodin and Toradol daily, or even frequently, is especially suspect. Although plaintiff had been prescribed Vicodin and other prescription pain-killers in the past (primarily before September 1990), there were supporting examination and

treatment records, as would be expected for the prescription of narcotic drugs. In the case of Toradol, the drug was given to plaintiff by injection, and its use is expressly contraindicated for use longer than five days, or in conjunction with other NSAIDs due to serious potential adverse effects. *See* nn. 11 & 12, *supra.*

**30.** The expert testified that plaintiff had acquired some skills (reading blueprints or schematics, use of hand tools and machinery) transferable to

(A.R.41.) A claimant who cannot use his acquired skills in other skilled or semi-skilled work is considered unskilled for purposes of the disability determination. 20 C.F.R. § 404.1565(a) (1996); *see also* Social Security Ruling (SSR) 83–10[31]; *accord, Terry v. Sullivan,* 903 F.2d 1273, 1277 nn. 7 & 8 (9th Cir.1990). Unskilled jobs are those that can usually be learned in 30 days or less, corresponding to an SVP level of 1 or 2. *See* 20 C.F.R. § 404.1469(a) (1996); *Terry,* 903 F.2d at 1276 (SVP of 2 "corresponds precisely to the definition of unskilled work" in the Commissioner's regulations). The ALJ was thus required, at step five, to identify unskilled jobs (SVP of 1 or 2) available in significant numbers in the national economy that are within plaintiff's functional capacity.

The DOT job of information clerk identified by the expert (DOT no. 237.376–022) has an SVP level of 4 and is, therefore, semiskilled. *(See* note 14, *supra.)* The expert did not provide a DOT number for the job of inspector, nor did he suggest the skill level involved. However, the general DOT category for the job of inspector (609.684–010 Inspector, general (Any industry)) also has an SVP of 4. The expert did not identify any particular subcategory of the information

clerk or inspector jobs that might be unskilled (nor did he even allude to the existence of particular subcategories).[32] He did not, accordingly, identify any specific job that is consistent with the ALJ's findings as to plaintiff's skill level and functional limitations.[33] *See Bonilla v. Secretary of Health, Education and Welfare,* 671 F.2d 1245, 1246 (9th Cir.1982) (per curiam) (at step five, Secretary must show that claimant has capacity to perform specific job(s) that exist in the national economy). Because the ALJ's disability determination was based on his erroneous finding that plaintiff can perform the jobs of information clerk and inspector as described by the expert, that determination cannot stand.[34]

## CONCLUSION

For the reasons discussed above, the Commissioner's decision in this matter cannot stand. However, those deficiencies can be remedied if the ALJ is permitted to conduct a supplemental hearing and make more complete findings, and it is therefore appropriate to remand the case for additional proceedings. *Singer v. Weinberger,* 513 F.2d 176, 178 (9th Cir.1975) (remand required to per-

---

grinding, polishing, and honing positions (A.R.87), but testified that an individual with all of the limitations described by the ALJ could not perform those jobs. (A.R.87–90.)

**31.** SSR 83–10 states: "The ability to perform skilled or semi-skilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semi-skilled work."

**32.** Defendant argues that the ALJ was entitled to rely on the expert's testimony that plaintiff could perform information clerk and inspector jobs in the local economy. There is a rebuttable presumption that the general job categories of the DOT and its supplementary Selected Characteristics are controlling. *Villa v. Heckler,* 797 F.2d 794, 798 (9th Cir.1986); *accord, Johnson v. Shalala,* 60 F.3d 1428, 1435 (9th Cir.1995). An ALJ may rely on expert testimony which contradicts the DOT "only insofar as the record contains persuasive evidence to support the deviation." *Johnson,* 60 F.3d at 1428. "Persuasive evidence" includes expert testimony that a particular subcategory of job not described in the DOT exists in the local market. *Id.* at 1428 & n. 7. In this case, the expert never identified any particu-

lar subcategory of the DOT job of "information clerk" nor of the generic job of "inspector" that might have a lower SVP and be available locally. Moreover, after all the hypothetical limitations were factored in, he testified that only about 320 of the generic inspector jobs existed locally.

**33.** It would be premature to address plaintiff's further argument that she is unable to perform any of the 400 subcategories of inspector jobs classified in the DOT, as none of those jobs were even remotely suggested by the expert's testimony. Given the array of limitations found by the ALJ and the extensive record in this case, the court declines to speculate as to which of the inspection jobs, if any, the expert might have had in mind.

**34.** Defendant contends that any deficiencies in the expert's testimony were irrelevant because the ALJ relied on the grids. However, the ALJ's own decision makes it clear that he expressly (and properly) declined to rely on the grids due to the existence of significant non-exertional limitations. He instead used the grids as a "framework for decisionmaking," supplemented by the expert's testimony. (A.R. 40, 41–42 (Finding Nos. 5, 7, 11, 12.)) *See Burkhart v. Bowen,* 856 F.2d 1335, 1340 (9th Cir.1988).

mit evaluation of evidence in light of correct legal standard); *Kail v. Heckler,* 722 F.2d 1496, 1497 (9th Cir.1984) (remand is proper where additional administrative proceedings could remedy defects in ALJ's decision). Accordingly, the decision of the Commissioner is reversed and the cause remanded for further proceedings consistent with this opinion.[35]

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**35.** This remand is pursuant to the fourth sentence of 42 U.S.C. § 405(g). See 28 U.S.C. § 2412(d) and *Melkonyan v. Sullivan,* 501 U.S. 89, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).